[Cite as *In re Z.D.Y.*, 2022-Ohio-4115.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

| | |
|---|---|
| IN RE: Z.D.Y. | : |
| | : |
| | :    Appellate Case No. 2022-CA-37 |
| | : |
| | :    Trial Court Case No. 2020-C-00038-0D |
| | : |
| | :    (Appeal from Common Pleas Court- |
| | :    Juvenile Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 18th day of November, 2022.

. . . . . . . . . . .

MEGAN A. HAMMOND, Atty. Reg. No. 0097714, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee, Greene County Children Services

GARY C. SCHAENGOLD, 4 East Schantz Avenue, Dayton, Ohio 45409
    Attorney for Defendant-Appellant, Mother

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** Appellant Mother appeals from a judgment granting permanent custody of her minor son, Z.D.Y., to Appellee, Greene County Children Services (GCCS). Mother contends that the juvenile court abused its discretion in awarding custody to GCCS because she had made substantial progress on her case plan. In addition, Mother argues that GCCS's concerns involved little more than "odor" from Mother's medically-prescribed marijuana use and potential transportation issues.

**{¶ 2}** After reviewing the record, we conclude that the court's decision was based on competent, credible evidence and that the court did not abuse its discretion in awarding permanent custody to GCCS. Accordingly, the judgment will be affirmed.

## I. Facts and Course of Proceedings

**{¶ 3}** Z.D.Y. was born in February 2020. Initially, Montgomery County Children Services (MCCS) handled the case involving Z.D.Y. After accepting an abuse and neglect referral, MCCS placed Z.D.Y. on a safety plan with a Greene County foster parent who was fostering Z.D.Y.'s half-sibling. A short time later, MCCS placed Z.D.Y. with Mother, so long as she stayed in the Family Violence Prevention Center (FVPC) in Xenia, Ohio. MCCS then transferred the case to GCCS.

**{¶ 4}** On March 4, 2020, GCCS filed a complaint in the juvenile court, alleging that Z.D.Y. was abused and dependent. According to the complaint, Mother was homeless and was residing at FVPC. Both Mother and Z.D.Y. had also tested positive for marijuana at the child's birth. Before giving birth, Mother had been living in her car. In

the original complaint, GCCS requested a disposition of protective supervision or temporary custody.

{¶ 5} The juvenile court initially scheduled the case for pretrial and an adjudication hearing on April 5, 2020, and appointed counsel for the child. The court also appointed a Court Appointed Special Advocate (CASA) for Z.D.Y. Previously, GCCS had filed a case plan, and the court approved the plan on March 10, 2020.

{¶ 6} On March 13, 2020, GCCS filed a neglect and dependency complaint and asked for an emergency hearing. The complaint alleged that FVPC had asked Mother to leave the shelter because she was smoking marijuana in her room with Z.D.Y. present. The shelter was concerned for the child's safety, as Mother had left him alone in the room, on his stomach and crying, when she went downstairs. Mother had also called Z.D.Y. an "assh***" and said that she "wished she would have had an abortion, or words to that effect." Complaint (March 13, 2020), R. 1-36.[1]

{¶ 7} When the GCCS caseworker and supervisor contacted Mother, she denied the marijuana allegations but admitted to having called her child the name and leaving him alone upstairs. Because Mother had to leave the shelter and had nowhere to go, GCCS called for an ex parte hearing and was granted emergency custody of Z.D.Y. *Id.* The complaint asked for temporary custody or, alternatively, an order for protective supervision.

{¶ 8} On March 13, 2020, the magistrate granted temporary custody to GCCS. The magistrate also set a pretrial and adjudication hearing for April 3, 2020, and a

---

[1] Each page in the lower court record is labeled and numbered. As a result, we will refer to particular pages by "R," followed by page numbers.

disposition hearing for May 6, 2020. In addition, the magistrate ordered Mother to: sign all releases; complete a mental health examination and follow all recommendations; complete a drug and alcohol assessment and follow all recommendations; complete parenting classes; comply with random drug screens; and obtain safe and stable housing. The magistrate further ordered that Z.D.Y. be assessed by "Help Me Grow," and all its recommendations were to be followed. Magistrate's Order (Mar. 13, 2020), R. 1-50 – 1-51. Another order was filed the same day, noting that the magistrate had granted GCCS emergency custody on March 12, 2020, pursuant to R.C. 2151.31 (which allows children to be taken into custody when certain factors are present).

{¶ 9} On March 18, 2020, GCCS filed an updated family case plan, which included Z.D.Y. and his sister, A.Y., who had been born in December 2018. According to the case plan, Mother would have restricted and supervised visitation twice a week for two hours at GCCS, due to Mother's drug use and the persons around Mother. The court approved the plan on April 1, 2020.

{¶ 10} Although Mother had been properly served, she did not appear for the April 3, 2020 adjudication hearing. At that time, the magistrate granted GCCS's motion to dismiss the March 4, 2020 complaint and proceed on the March 13, 2020 complaint. Based on the matters presented, the magistrate found Z.D.Y. neglected and dependent, and maintained temporary custody with GCCS. The judge adopted the magistrate's decision the same day. No objections to the magistrate's decision were filed.

{¶ 11} On May 6, 2020, the magistrate held a disposition hearing. While Mother had also been notified of this hearing, she again failed to appear. Based on the evidence

presented, the magistrate found that Mother had a substance abuse disorder, had not cooperated with GCCS, and had stopped engaging with GCCS after April 8, 2020, although the agency had reached out to her. Magistrate's Decision (May 7, 2020), R. 1-72. The magistrate then found that awarding temporary custody to GCCS was in Z.D.Y.'s best interest. *Id.* at R. 1-73. The judge adopted the magistrate's decision the same day. Again, Mother did not file objections to the decision.

**{¶ 12}** A case plan update was filed on July 30, 2020, and was approved on August 6, 2020. A semi-annual administrative review (SAR) was then filed on August 18, 2020. According to the SAR, Mother had not had any contact with GCCS or Z.D.Y. since April 8, 2020, and Z.D.Y.'s father was unknown. SAR, R. 1-98. GCCS recommended that temporary custody continue for 180 days, with a supplemental plan of permanent custody to the agency with a goal of adoption. *Id.* at R. 1-100.

**{¶ 13}** On January 25, 2021, GCCS filed a motion seeking to modify temporary custody to permanent custody. This was based on claims that Z.D.Y. could not be placed with either parent within a reasonable time and that Z.D.Y. had been abandoned, because Mother had not visited with him for at least 90 days. The court then set a permanent custody hearing for March 5, 2021. On January 28, 2021, the court appointed an attorney for Mother.

**{¶ 14}** The CASA filed a report on February 1, 2021, recommending that the court grant permanent custody to GCCS. The CASA noted that Mother had had only 15 minutes of contact with Z.D.Y. in the previous 11 months and had failed to maintain contact with GCCS. The report further noted that Mother's progress on the case plan

was unknown.   Report and Recommendations of CASA, R. 1-118.

{¶ 15} On February 2, 2021, the court approved GCCS's January 25, 2021 updated case plan.   A SAR filed on February 11, 2021, again indicated that Mother had seen the child for only 15 minutes since April 2020.   The SAR did note that Mother had begun to re-engage with GCCS in January 2021 and had been scheduled to complete her visitation orientation on February 10, 2021.   SAR, R. 1-133.   A CASA report filed on February 18, 2021, stated that Mother had cancelled the orientation and had rescheduled for February 22, 2021.   Mother had also failed to participate in the agency's February 10, 2021 administrative review.   Report and Recommendations of CASA, R. 1-141.   In addition, the CASA noted that Z.D.Y. was being treated for a saccadic eye movement disorder that prevented normal visual interaction.   *Id.*

{¶ 16} On February 24, 2021, the CASA filed another report, again recommending that the court award permanent custody to GCCS.   The CASA noted that she had tried to contact Mother but had had no success.   Z.D.Y. had been exposed to drugs in utero and had tested positive for THC at birth.   Mother had also not attended any medical visits.   At the time of the report, Z.D.Y. was receiving visual therapy for his eye disorder and occupational therapy for developmental delays.   *Id.,* R. 1-144.

{¶ 17} The CASA further noted that Mother had struggled with housing since 2019 and had been homeless at times.   Mother was employed at Wendy's but had been evicted from her rental in February 2021.   Mother had lived in that rental only since October 2020.   The CASA spoke with another rental complex on January 29, 2021, and, reportedly, Mother had obtained a two-bedroom apartment.   The CASA further

commented that Mother had been a no-show for two orientations at the visitation center in October 2020, and repeated follow-up calls had been ignored. Mother had not attended a February 23, 2021 orientation. In addition, Z.D.Y. had not bonded with Mother, and Mother had not maintained consistent contact with the child, the foster parents, or parties to the case. *Id.* at R. 146.

{¶ 18} Mother did finally appear in court for a review hearing on February 25, 2021. Magistrate's Decision (Feb. 25, 2021), R. 1-148. In this decision, the magistrate noted that Mother had not been in continuous contact with GCCS until recently, had seen the child once virtually in April 2020 and once face-to-face in October 2020, and had made sporadic progress on her case plan. *Id.* The magistrate recommended continuation of GCCS's temporary custody pending the March 5, 2021 permanent custody hearing. *Id.* at R. 1-149. The judge signed the order the same day, and no objections were filed.

{¶ 19} On March 5, 2021, the court conducted a pretrial and set the permanent custody hearing for May 18, 2021. An updated case plan approved by the court on March 10, 2021, noted that Mother often turned to THC to cope with daily stressors and "had acknowledged that her THC use is not a healthy way to cope with her stress or trauma." Family Case Plan, R. 1-155. The case plan further observed that "[Mother] has stated that she would like to learn new coping skills so she is not putting herself or the children at risk. However, [Mother] plans to obtain her medical marijuana card soon." *Id.* At that time, Mother had not visited with the Z.D.Y. since April 2020.[2] *Id.* The case

---

[2] The October 2020 encounter previously mentioned was a brief face-to-face encounter on October 15, 2020, when Z.D.Y. was taken to the hospital. SAR (Feb. 10, 2021), R. 1-133; Magistrate's Decision (Feb. 25, 2021), at R. 1-148.

plan included, among other things, Mother's consistent visitation with the child, attendance at his medical visits to understand his medical needs, reliable transportation and employment, testing negative for illegal and non-prescribed medications, safe and stable housing free from drugs, and a "healthy way of coping with stress." *Id.*

{¶ 20} On March 10, 2021, the parties filed an agreed entry granting GCCS a first extension of temporary custody, vacating the permanent custody hearing set for May 18, and setting a review hearing for August 5, 2021. Agreed Entry (March 10, 2021), R. 1-164 – 1-165.

{¶ 21} On July 1, 2021, GCCS filed a motion to extend temporary custody, and the court scheduled a hearing for August 5, 2021. The CASA then filed an updated report on August 3, 2021. In the report, the CASA noted that from March 22, 2021 through June 16, 2021, Mother had been scheduled to receive visits of two hours on one day a week at the Visitation Center. Mother had cancelled four visits and was a no-show on three others. Of the six successful visits, three ended early, and 16 violations of policy occurred. Updated CASA Investigation Facts and Findings, R. 1-171.

{¶ 22} Visits then occurred at Mother's home on the same schedule for a month and were increased to twice a week for two hours. Six visits were successful, with Mother having cancelled two and GCCS having cancelled one. The CASA observed two visits and found that Z.D.Y. had demonstrated no attachment to Mother. Mother also accepted phone calls during the visits, had no toys for the child, and had the apartment sparsely furnished. Z.D.Y.'s room was empty, and Mother had no furnishings or equipment for him. *Id.* at R. 1-171 – 1-172.

{¶ 23} Between March 3, 2021, and the date of the report (August 3, 2021), Mother had attended two of seven "Help Me Grow" visits, none of eight occupational therapy visits, and two specialist/well-child visits. *Id.* at R. 1-172. Drug screens had been administered in February and July 2021, and Mother had tested positive on both. *Id.* The CASA recommended that Z.D.Y. remain in the agency's temporary custody. *Id.*

{¶ 24} After the hearing on August 5, 2021, the magistrate found Mother had substantially complied with the case plan, granted a second extension of GCCS's temporary custody, and set a review hearing for January 27, 2022. Magistrate's Decision (Aug. 5, 2021), R. 1-179 – 1-180; Corrected Magistrate's Decision (Aug. 5, 2021), R. 1-182. At that time, the court stressed that Mother had to make every effort to complete the case plan objectives, as no further extensions could be granted, and GCCS needed to make alternate arrangements to finalize permanency. *Id.* at R. 1-182. No objections to these decisions were filed.

{¶ 25} The SAR filed on August 13, 2021, indicated that Mother was engaging in services and had made significant progress on demonstrating stability. However, concerns still existed over Mother's drug use, Z.D.Y.'s medical issues (which had increased), and the need for Mother to increase her attendance at medical appointments. SAR, R. 1-186. An update of the Family Case Plan, which was approved by the court on August 24, 2021, stated that visitation had been going well and would be unsupervised. Family Case Plan, R. 1-195.

{¶ 26} In September 2021, the review hearing was rescheduled to January 24, 2022, and on October 12, 2021, the court substituted a new CASA because the original

CASA could no longer continue. An updated Family Case Plan filed on October 15, 2021, indicated that visitations had gone back to being supervised because a police event had occurred at Mother's home. Specifically, a male had overdosed, and Mother had been asked to leave her home as a result. Updated Family Case Plan, R. 1-205. Mother was then living with a friend and did not have independent housing. Mother had also tested positive for THC. *Id.* at R. 1-206. In mid-November 2021, Mother's visits were changed again to unsupervised.

{¶ 27} On January 6, 2022, GCCS filed a motion asking to modify temporary custody to permanent custody. The motion was based on Mother's instability, inconsistency, and lack of knowledge of Z.D.Y.'s special needs. Due to these issues, GCCS could not guarantee that Mother would follow through with the child's special needs or have a safe place for him to live. According to the motion, Mother did not have stable housing, as she had been evicted from her prior housing due to the drug incident and had also been asked to leave her friend's house in December 2021.

{¶ 28} In addition, Mother had attended only 27 of 55 "Help Me Grow" visits, four of 35 therapy appointments, and three of 16 doctor's appointments. Mother also continued to test positive for THC on drug screens. While Mother had provided GCCS with a medical marijuana card on December 21, 2021, GCCS was concerned that Mother and her friends had been using marijuana around Z.D.Y., as he had returned from visits having a strong marijuana smell. Motion for Permanent Custody (Jan. 6, 2022), R. 1-230. An affidavit filed the same day stated that Mother was no longer living at her reported address and had not given GCCS a new address. Affidavit, R. 1-233.

{¶ 29} On January 14, 2022, the court set a permanent custody hearing for March 15, 2022. The court further noted that Mother had retained an attorney. Judgment, R. 1-234. The same day, the CASA filed an updated report. Essentially, the report indicated that, on January 3, 2022, when the CASA had tried to schedule a visit, Mother had misrepresented where she was living. Ultimately, the CASA learned that Mother's roommate had kicked Mother out over a month earlier; GCCS had not been told and was unaware of where Mother had taken the child on three visits during December 2021. Upon learning these facts, the CASA asked GCCS to initiate supervised visitation for future visits. Updated CASA Investigation and Findings, R. 1-238.

{¶ 30} On January 19, 2022, GCCS filed an updated Family Case Plan, stating that visits would occur at the Visitation Center because the agency did not know where Mother was living. The visits would also be supervised because of concern that Mother and her roommates were using THC around Z.D.Y. during visits. Update to Family Plan, R. 1-241. The court approved the plan on January 20, 2022.

{¶ 31} The CASA submitted a preliminary report on January 28, 2022, recommending that GCCS be given permanent custody. On January 31, 2022, the magistrate filed a decision following a January 24, 2022 review hearing. The decision noted that Mother had not visited Z.D.Y. since December 29, 2021, and the Visitation Center had not been able to reach Mother to establish a visitation schedule. Magistrate's Decision (Jan. 31, 2022), R. 2-153. In addition, Mother had no independent stable housing, her last drug screen in October 2021 had been positive for marijuana, Mother had obtained a medical marijuana card in December 2021, and Z.D.Y.'s paternity had not

been established.  *Id.*

**{¶ 32}** The magistrate continued temporary custody with GCCS pending the permanent custody hearing, because "[t]he child cannot be placed with Mother due to her lack of stable housing and lack of consistent visitation and cannot be placed with father as paternity has yet to be established."  *Id.* at R. 1-253 – 1-254.  The judge adopted the decision the same day, and no objections were filed.

**{¶ 33}** On February 14, 2022, GCCS filed a SAR, which was approved.  The next day, the court, on its own motion, continued the permanent custody hearing to April 26, 2022.  Shortly before the hearing date, the CASA filed a detailed report recommending that the court award permanent custody to GCCS.  Report and Recommendations of CASA (Apr. 18, 2022), R. 1-312 – 1-323.

**{¶ 34}** The permanent custody hearing was held on April 26, 2022, as scheduled. During the hearing, the juvenile judge heard testimony from the following individuals: Z.D.Y.'s foster mother; a speech pathologist at Dayton Children's Hospital; a developmental specialist from Four Oaks Early Intervention; the CASA; the GCCS caseworker assigned to Mother's case; and Mother.  Various exhibits were also admitted.  After hearing the evidence, the judge filed a judgment entry on June 10, 2022, granting permanent custody of Z.D.Y. to GCCS and terminating Mother's parental rights. Mother then appealed from the court's judgment.

## II.  Alleged Abuse of Discretion

**{¶ 35}** Mother's sole assignment of error states that:

The Trial Court Erred in Granting the Motion of Greene County Children's Services for Permanent Custody.

{¶ 36} Mother contends that the juvenile court erred in granting permanent custody because she had made significant progress on her case plan. According to Mother, GCCS's concerns amount to little more than an "odor" of marijuana and potential transportation issues. Before addressing Mother's arguments, we will first outline the relevant standards that apply.

### A. Applicable Standards for Terminating Parental Rights

{¶ 37} "The United States Supreme Court has stated that parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by this Court.' " *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Ohio has also held that "parents who are 'suitable' have a 'paramount' right to the custody of their children." *B.C.* at ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.)

{¶ 38} However, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App. 1974). "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *B.C.* at ¶ 20.

{¶ 39} GCCS's permanent custody motion was brought pursuant to R.C. 2151.413. Motion Requesting Modification of Temporary Custody to Permanent Custody (Jan. 6, 2022), R. 1-230. The grounds alleged were that Z.D.Y. could not or should not be placed with either parent within a reasonable time, and that Z.D.Y. had been in GCCS's temporary custody for 12 or more months of a continuous 22-month period. *Id.*

{¶ 40} As pertinent here, R.C. 2151.413(D)(1) provides that "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child." The purpose of the "12 of 22" requirement is to "balance the importance of reuniting a child with the child's parents against the importance of a speedy resolution of the custody of a child." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 22.

{¶ 41} Here, there is no dispute that Z.D.Y. was in GCCS's custody for the needed period of time. The court granted GCCS temporary custody on May 6, 2020, and when the agency filed for permanent custody on January 6, 2022, Z.D.Y. had continuously been its custody for 20 months. In such situations, "the agency still must prove by clear and convincing evidence, that it is in the child's best interest to grant permanent custody to the agency." *In re N.M.P.,* 160 Ohio St.3d 472, 2020-Ohio-1458, 159 N.E.3d 241, ¶ 26, citing R.C. 2151.414(B)(1).

{¶ 42} The juvenile court did not consider the alternate ground under R.C. 2151.413(A) and R.C. 2151.414(B)(1)(a), i.e., that "the child cannot be placed with either

of the child's parents within a reasonable time or should not be placed with the child's parents." Instead, the court's decision was based on the "12 of 22" standard. Judgment Entry (June 10, 2022) ("Final Judgment"), R. 1-445. The court did say, after discussing GCCS's reasonable efforts, that Z.D.Y. could not be returned home within a reasonable time. *Id.* at R. 1-450. However, that was not the ground on which the court relied, and we need not consider the alternate basis for GCCS's permanent custody motion.

{¶ 43} As relevant here, R.C. 2151.414(B)(1) states that:

[T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

{¶ 44} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 45} In deciding a child's best interest, courts analyze factors set forth in R.C. 2151.414(D)(1)(a)-(e) and (E).   These include, but are not limited to: "1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable."   *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15, citing R.C. 2151.414(D).

{¶ 46} We will not overturn a juvenile court's decision to terminate parental rights "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established."   *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re Forrest S.*, 102 Ohio App.3d 338, 344-345, 657 N.E.2d 307 (6th Dist.1995).   "We review the trial court's judgment for an abuse of discretion."   *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (which applied an abuse of discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 47} " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable."   *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), quoting *Huffman*

*v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable," rather than being "unconscionable or arbitrary." *Id.*

{¶ 48} A further point is that "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Specifically, since "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.* This discretion, while broad, is "not absolute," however, and is guided by statutory language. *Id.*

{¶ 49} With these standards in mind, we will consider the court's analysis of Z.D.Y.'s best interest, as that is the only matter at issue.

## B. Best Interest of the Child

{¶ 50} In concluding that granting permanent custody to GCCS was in Z.D.Y.'s best interest, the juvenile court discussed each factor in R.C. 2151.414(D)(1)(a)-(d) in detail and also stated that it had considered R.C. 2151.414 (E)(7)-(11) (which is required by R.C. 2151.414(D)(1)(e)). Final Judgment at R. 445-450. We will take the same approach.

### 1. The Child's Relationships

{¶ 51} In its decision, the court considered the relationship between Z.D.Y. and various people, including Mother, the father, siblings, the foster family, and other relevant persons. First, the court found that the interrelationship between Mother and Z.D.Y. was detrimental to Z.D.Y. *Id.* at R. 445. After reviewing the evidence, including the custody transcript, we agree and find that competent, credible evidence supported the court's decision.

{¶ 52} The juvenile court focused on the lack of bonding, the nine-month period during which Mother had no contact with Z.D.Y., Mother's failure to regularly participate in Z.D.Y.'s exhaustive list of medical appointments to address developmental and medical issues, Mother's lack of ownership of her lack of contact with Z.D.Y. for months, and Mother's history of homelessness and transportation and substance abuse issues.

{¶ 53} Mother was homeless while pregnant with Z.D.Y. and was either living in her car or with an ex-girlfriend when Z.D.Y. was born. Transcript of Apr. 26, 2022 Permanent Custody Hearing ("Tr."), p. 110. After Z.D.Y.'s birth, Mother moved into a shelter, but she was ejected a few weeks later for the reasons previously mentioned. *See also id.* at p. 111.

{¶ 54} As a result of being ejected, Mother again became homeless, and on March 12, 2020, Z.D.Y. was placed in foster care. *Id.* at p. 7. Mother was then homeless for eight months, living in her car and other places. *Id.* at p. 211-212. GCCS had no idea where Mother was between April 2020 and January 2021, and Mother did not contact the agency during that time; she also did not visit Z.D.Y. *Id.* at p. 112 and 190.

{¶ 55} Notably, Mother's explanation for her lack of contact was not credible. She claimed she had no phone. *Id.* at p. 191. Even if this were true, Mother was employed during that time, *id.* at p. 212, and she could also have asked to borrow a phone to let GCCS know where she was or to arrange visitation. Mother could even have written to let the agency know of her whereabouts. Instead, she did nothing for at least nine months.

{¶ 56} Even after Mother resumed contact with GCCS in January 2021, she continued to struggle with maintaining stable housing. Tr. at p. 108-109, 113-114, and 122. Mother had an apartment from January or February 2021 until August or September 2021, when she was forced to leave because a man had overdosed while at her apartment. *Id.* at p. 113 and 199-200. Mother was also jailed at that time as a result of the incident, although she ultimately was not charged. *Id.* at p. 200. This issue caused Mother's visitation to be moved back to supervised from unsupervised, although unsupervised visits had only been instituted in the middle of 2021, i.e., a few months earlier. *Id.* at p. 123 and 135.

{¶ 57} Mother then lived at a friend's home in Fairborn, Ohio, between September 2021 and December 2021. However, she was forced to leave that home as well. *Id.* at p. 79 and 113-114. Mother also concealed the fact that she was not living at the Fairborn home, which caused GCCS to unknowingly leave Z.D.Y. with Mother for unsupervised visitation. *Id.* at p. 124-125. This caused both the CASA and GCCS to be concerned for Z.D.Y.'s safety, because they did not know where he had been taken. *Id.* at p. 81 and 125.

**{¶ 58}** Subsequently, in January 2022, Mother was temporarily living in an apartment on Republic Street in Dayton, Ohio. *Id.* at p. 114. Mother then signed a lease in late February 2022 for an apartment on Linden Avenue in Dayton. She was living there at the time of the April 2022 custody hearing, meaning she had only been in that place for about two months. *Id.* at p. 115. During that time, Mother asked GCCS to pay her April apartment rent of $600, which GCCS did. Although Mother claimed she had asked for help so that she could save money, the fact that she requested help almost immediately caused concern that Mother would not be able to maintain stability. *Id.* at p. 178. Although GCCS had worked with Mother for two years, the concern over instability in housing that initially caused agency involvement remained the same. *Id.* at p. 146 and 148.

**{¶ 59}** Concerning substance abuse, GCCS's concern was not simply over an odor of marijuana. While Mother had apparently completed a drug program and parenting classes in 2019 (due to the agency's involvement with another of Mother's children), these interventions were apparently not successful, as Mother tested positive for cocaine and THC during her pregnancy with Z.D.Y. and used alcohol until August 2019 (also during her pregnancy). Report and Recommendations of CASA (Feb. 24, 2021), at R. 1-144; Report and Recommendations of CASA (Apr. 18, 2022), at R. 1-313 – 1-314; Ex. 11, p. 17 (Oct. 16, 2019 Lab Report), p. 19 (Sept. 29, 2019 Lab. Report); and p. 21 (August 29, 2019 Lab Report). *See also* Tr. at p. 130 and 213. As previously noted, Mother and Z.D.Y. also both tested positive for marijuana at Z.D.Y.'s birth in February 2020.

**{¶ 60}** Mother discounts GCCS's concern over Z.D.Y.'s having access to Mother's

medical marijuana because Z.D.Y. has "never actually been around mother when she takes her prescribed marijuana." Appellant's Brief, p. 10. This statement is inaccurate for several reasons. First, Mother had only had a medical marijuana card since December 2021. Consequently, nothing would have been "prescribed" before that time.

{¶ 61} Mother also testified that she smoked marijuana three to seven times a day. Tr. at p. 228. She did not testify that she refrained from smoking marijuana while in Z.D.Y.'s presence. In fact, Z.D.Y. had come home from visits with Mother smelling of marijuana. *Id.* at p. 75. Obviously, Z.D.Y. had been around Mother when she used marijuana. This also was the reason FVPC ejected Mother in March 2020.

{¶ 62} Furthermore, even if an individual has a medical marijuana card, "[t]he smoking or combustion of medical marijuana is prohibited." R.C. 3796.06(B)(1). As a result, Mother was not taking marijuana as recommended by a physician, and her use was and had been illegal.

{¶ 63} GCCS also had concerns about Mother's ability to "pay attention, be attentive, and be able to acknowledge" Z.D.Y.'s needs while on marijuana. Tr. at p. 177. As a result, the concern was not merely over "odor." Mother's testimony in this regard was that "I get their concern as far as the effect on me, but let's be honest, since they've met me, I'm high every day off weed and it doesn't affect me at all. I still work. I still meet with them." Mother's personal belief that being "high" did not affect her was irrelevant and most likely misplaced. Moreover, there were substantial periods of time when Mother did not meet with GCCS. Her attendance at both visitation and Z.D.Y.'s medical and therapy appointments had also been erratic.

{¶ 64} For example, out of 66 scheduled visitations with Z.D.Y., Mother had attended only 32. Tr. at p. 18-19. This did not include visits that were cancelled for some reason other than Mother's own cancellations or no-shows. *Id.*

{¶ 65} Moreover, Z.D.Y. has special needs, and he had been seen every two weeks since June 2020 by a developmental specialist in the Four Oaks Early Intervention program. *Id.* at p. 46-47. In this program, developmental specialists work with children from birth to age three on developmental milestones. *Id.* at p. 46. According to the developmental specialist who testified, a caregiver's consistent participation in these sessions is essential for the child's development. *Id.* at p. 54 and 58.

{¶ 66} Notably, Mother did not attend any sessions in 2020. Her first attendance was in March 2021; she then failed to attend again for almost six months. *Id.* at p. 51-52. Mother's attendance thereafter was sporadic, with a few more sessions in 2021 and more than a three-month gap until her attendance in mid-March 2022, shortly before the permanent custody hearing. *Id.* at p. 53.

{¶ 67} Z.D.Y. also began seeing a speech therapist at Children's Medical Center in October 2021, due to global delays in language. Tr. at p. 36-37. According to the speech therapist, it was essential for caregivers to attend these therapy sessions because they needed to know what worked and needed to set up their day at home to conduct exercises with the child. *Id.* at p. 38 and 41. Z.D.Y.'s foster mother brought him to 20 appointments between October 21, 2021, and the April 2022 custody hearing; Mother attended only about nine appointments. *Id.* at p. 41.

{¶ 68} Z.D.Y. also attended the Neonate Abstinence Syndrome Clinic, which

addresses problems that children exposed to drugs in utero can have. *Id.* at p. 8. In addition, Z.D.Y. had been seen at a low-vision clinic in Cincinnati due to problems with his eyesight and by a neurologist for low muscle tone. *Id.* at p. 9-11. Of 20 doctor's visits, which included the low-vision clinic and neurologist, Mother attended only five. *Id.* at p. 22.

{¶ 69} Mother claimed that she did not have transportation. However, she was able to obtain transportation to doctor's appointments through CareSource. *Id.* at p. 174, 196, and 206-207. GCCS also gave Mother gas cards, bus tokens and tickets, gift cards, and Uber cards. *Id.* at p. 143. In view of the above facts, competent, credible evidence supported the juvenile court's conclusion that Mother had failed to regularly participate in the medical and therapy appointments required to address Z.D.Y.'s needs.

{¶ 70} As to the court's finding about the lack of bonding, competent, credible evidence also supported this conclusion. As noted, Mother had been absent for much of Z.D.Y.'s life. Even when Mother had resumed contact with GCCS, she failed to exercise quite a few opportunities to visit Z.D.Y. and to attend therapy and medical appointments (which would have given her additional chances to bond with the child). In fact, after visitation was reinstated in January 2022 (after Mother was asked to leave her Fairborn housing), Mother had nine opportunities for visitation before the custody hearing. However, she cancelled three visits and was a no-show for another. Tr. at p. 177.

{¶ 71} GCCS also assisted Mother with transportation in connection with visitation. In addition to the bus tokens and so forth, Greene County or the caseworker transported Z.D.Y. to Mother's home for visitation. *Id.* at p. 32, 123, and 143.

{¶ 72} The CASA appointed in October 2021 had observed Mother and Z.D.Y. twice at the Visitation Center.   The CASA stated that Z.D.Y. tended to play by himself, and she did not observe much interaction between Mother and Z.D.Y.   *Id.* at p. 75.   The CASA contrasted this with Z.D.Y.'s behavior at his foster home, where he was more at ease, interacted very playfully with his foster siblings, and was more loving with his foster mother, giving her hugs and having fun.   *Id.*   The report of the CASA, who recommended that the court grant permanent custody to GCCS, expressed concern over the lack of bonding and attachment between Mother and Z.D.Y.   *Id.* at p. 81.   The lack of bonding was also one reason why GCCS filed for permanent custody in January 2022. *Id.* at p. 138.   Had Mother consistently exercised visitation, a bond might have developed.

{¶ 73} Because there had not seemed to be a bond between Mother and Z.D.Y., the development specialist had worked on trying to create a bond.   She reported that she had recently made "some" progress.   Tr. at p. 64-65.   This specialist stated, however, that the pandemic had not necessarily been the reason for the lack of a bond; instead, the cause had been the large gaps between appointments.   *Id.* at p. 65.   Again, Mother had chosen to attend less than half the therapy appointments that were available after she resumed contact with GCCS in 2021.   She also let months at a time lapse between her attendance at appointments.   *Id.* at p. 60.   Accordingly, the court's conclusion about the lack of bonding was supported by the evidence.

{¶ 74} Based on the preceding discussion, the juvenile court's finding that Mother's relationship with Z.D.Y. was detrimental to Z.D.Y. was supported by competent, credible

evidence.

{¶ 75} Concerning the remaining relationships, the court found that no father was known, that Z.D.Y. had no relationship with any siblings, that Z.D.Y. had a relationship with his foster family, with whom he had lived with since he was two weeks old, that the foster mother had overseen an extensive schedule of regular and medical therapy appointments, that the foster mother had considered adopting Z.D.Y., and that no relationships with other relatives were relevant. Final Judgment at R. 1-446. Competent, credible evidence supported these findings. *See* Tr. at p. 7-15, 24, 41, 50, 71, 76, 91, 141-143, and 179-181.

## 2. The Child's Wishes

{¶ 76} The next factor concerns the child's wishes. The court stated that it did not conduct an in camera interview due to the child's young age. Mother has not challenged this finding.

## 3. Custodial History

{¶ 77} In discussing the custodial history, the court focused on the fact that Z.D.Y. had been in agency custody since he was two weeks old, that Z.D.Y. had had infrequent visitation with Mother since, and that stable housing had been an issue until recently. Based on the preceding discussion, these findings were supported by competent, credible evidence.

#### 4. The Need for Legally Secure Placement

{¶ 78} In discussing the child's need for a legally secure placement, the juvenile court focused on many items, including the matters previously discussed. The court further stressed that while a Covid-19 emergency had been declared on March 9, 2020, and Covid-19 restrictions had affected case planning, Mother had not been prevented from accessing case plan services. The pandemic also had not precluded Mother from abstaining from smoking marijuana three to seven times per day, had not prevented Mother from participating in medical and therapy appointments and visitation via Zoom, had not prevented Mother from addressing her own substance abuse issues, and had not prevented Mother from being reunified with Z.D.Y. Instead, Mother had not been reunified due to her "own actions and choices." Final Judgment at R. 1-447. Based on the preceding discussion, these findings were supported by competent, credible evidence.

{¶ 79} While discussing this factor, the court also questioned Mother's judgment. First, the court was concerned about Mother's judgment in posting a social media request for help with installing a baby gate and allowing a stranger (who then overdosed) into her home. The court also focused on Mother's lack of honesty with GCCS. *Id.* at R-1-448. Again, these observations were supported by competent, credible evidence. *See* Tr. at p. 113 and 199-201,

{¶ 80} In addition, the court stressed Z.D.Y.'s special needs, which were substantial, and Mother's inability to meet his needs. This resulted from Mother's inconsistency in participating in medical appointments and learning skills needed to help the child. Final Judgment at R. 1-448 – 1-449. The court noted that Mother had been

made aware of these medical issues and had been asked to engage in programs and parenting classes. However, she had made no progress in achieving these case plan objectives. The court further found that Z.D.Y. could "not be placed in the mother's home within a reasonable time because she does not have the requisite knowledge to address at home the child's medical issues and has not shown the ability to maintain ongoing medical appointments for the child in order for him to reach his developmental milestones while keeping him safe." Final Judgment at R. 1-449. These findings were supported by competent, credible evidence.

### 5. R.C. 2151.414(E)(7)-(11)

{¶ 81} The final issue related to R.C. 2151.414(D)(1)(e), which asks courts to consider if R.C. 2151.414(E)(7)-(11) pertains to the child. These parts of the statute concern whether a parent has been convicted of or has pled guilty to various offenses, has withheld food or medical treatment, has placed the child at substantial risk due to alcohol or drug abuse, has abandoned the child, or has had parental rights previously terminated with respect to a sibling. The juvenile court did not specifically discuss these matters but did say it had considered them. Final Judgment at R.1-450.

{¶ 82} Mother has not argued that these factors were relevant. Furthermore, a review of the record does not indicate that they applied, although the court may have been permitted to assume that Mother had abandoned Z.D.Y. *See* R.C. 2151.011(C) (stating that for purposes of R.C. Chap. 2151, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more

than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days").

**{¶ 83}** As GCCS points out, the Supreme Court of Ohio has held that juvenile courts do not have "to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31. Here, the court stated that it had considered all the factors, and that was sufficient.

**{¶ 84}** Accordingly, there was no abuse or discretion or error in the juvenile court's decision. Mother's sole assignment of error is overruled.

### III. Conclusion

**{¶ 85}** Mother's assignment of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . .

DONOVAN, J. and EPLEY, J., concur.

Copies sent to:

Megan A. Hammond
Gary C. Schaengold
Brianna Britton, GAL
Hon. Amy H. Lewis