[Cite as *In re K.P.*, 2023-Ohio-90.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

IN THE MATTER OF: K.P., C.L., K.V.     :
:
:    C.A. No. 2022-CA-43
:
:    Trial Court Case Nos. 2019-C-00015;
:    2019-C-00016; 2019-C-00017
:
:    (Appeal from Common Pleas Court-
:    Juvenile Division)
:

. . . . . . . . . . .

O P I N I O N

Rendered on January 13, 2023

. . . . . . . . . . .

MEGAN A. HAMMOND, Attorney for Appellee

KELLY M. SCHROEDER, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Mother appeals from judgments granting permanent custody of her children, C.L. and K.V., to Greene County Children Services ("GCCS") and ordering that Mother's child, K.P., be placed in a planned permanent living arrangement ("PPLA") with the

agency. According to Mother, the court's decision was not in the children's best interests and was against the manifest weight of the evidence.

{¶ 2} We conclude that the trial court did not abuse its discretion in granting permanent custody of two of Mother's children to GCCS or in ordering that a third child be placed in a PPLA. The court's decision was also not against the manifest weight of the evidence. Mother's persistent failure to remedy her substance abuse problems and to recognize their negative impact on her children provided clear and convincing evidence that the permanent custody award and the PPLA placement were in the children's best interests. The court's decision was supported by competent, credible evidence. Accordingly, the judgments of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 3} On October 11, 2019, GCCS filed complaints in the trial court alleging that K.P. (age 13), C.L. (age five), and K.V. (around six weeks old) were dependent because they lacked adequate parental care or support due to the mental or physical condition of their parents, guardians, or custodians, and whose condition or environment was such as to warrant the state in assuming their guardianship. The three complaints were designated as Case Nos. 2019-C-00015, 2019-C-00016, and 2019-C-00017. For the purpose of simplicity, we will refer to the pleadings in Case No. 2019-C-00017, unless otherwise indicated. That complaint involves K.V., the youngest child.

{¶ 4} The complaint asked the court to grant GCCS temporary custody or, alternatively, protective supervision. According to the complaint, GCCS had received a

referral with allegations of physical abuse on September 6, 2019. The referral report stated that K.V.'s cord blood results were positive for methamphetamine and amphetamine. GCCS had also received a prior referral on August 31, 2019, because Mother had been positive for amphetamines at K.V.'s birth. At the time, Mother stated that she used an inhaler, which a hospital pharmacist said could cause a false positive for amphetamines. However, Mother refused to allow hospital staff to put cotton balls in K.V.'s diaper to get a urine sample. A later referral on September 6, 2019, indicated that Mother's positive screen for drugs was not, in fact, a false positive.

{¶ 5} The complaint further stated that Mother had a history of drug abuse and that K.P. and C.L. had previously been in GCCS's custody. Additionally, while the GCCS caseworker had tried to speak with Mother to develop a safety plan, Mother had not responded. On October 11, 2019, GCCS also filed a motion for an order of pre-dispositional interim custody. The court then set a hearing for November 7, 2019.

{¶ 6} GCCS filed a case plan with the court on October 24, 2019. At that time, the plan was to maintain the children in Mother's home. At the November 7, 2019, hearing, the court found the children dependent and granted protective supervision to GCCS. The court ordered Mother to sign all releases, comply with random drug screens, and complete a drug and alcohol assessment and follow all recommendations. The court also set a disposition hearing for December 10, 2019.

{¶ 7} On November 20, 2019, privately-retained counsel entered an appearance for Mother, as she wished to retain her own counsel and did not want to be represented by the public defender. On December 10, 2019, Mother appeared with counsel at the

hearing, as did K.P.'s father (B.P.) and K.V.'s father (R.V.). C.L.'s father was deceased.

{¶ 8} At that time, the court ordered the parents to take drug screens. Mother tested positive, and the court informed Mother that she could refute the drug screen by submitting to a 10-panel hair or nail follicle test within a week. Magistrate's Order (Dec. 10, 2019), p. 1. The hearing was also continued until December 18, 2019.

{¶ 9} Mother did not submit to a follicle test, and an order filed on December 18, 2019, indicated that Mother had tested positive for amphetamines on December 10, 2019, and that R.V. had also tested positive recently for methamphetamines. The order filed in K.P.'s case additionally noted that there was an existing protection order between K.P. and her father; as a result, K.P and B.P. had no contact at that time.

{¶ 10} The magistrate granted temporary custody of all three children to GCCS on December 18, 2019. Mother then filed objections to the magistrate's decision on December 30, 2019, and also requested leave to file supplemental objections after a transcript was filed. The court granted leave on January 6, 2020, and ordered a transcript to be prepared at Mother's expense. In addition, the court ordered Mother to file the transcript by February 3, 2020, and to file her supplemental objections by March 3, 2020.

{¶ 11} On January 7, 2020, GCCS filed an amended case plan, adding the two fathers and making other changes due to the children's placement in the agency's temporary custody. At that time, Mother was required to sign all releases of information, complete a substance abuse assessment and follow recommendations, provide a safe and stable home free from substance abuse, submit to random drug screens, meet with

the caseworker monthly and notify the caseworker of any contact changes, and consistently visit the children.

{¶ 12} The case plan also noted that R.V. (K.V.'s father) had been abusing methamphetamines while caring for K.V. and Mother's other children. It further said reports had indicated that R.V. still lived with Mother, although he claimed he lived with an aunt. The court adopted the case plan on January 17, 2020. A family case plan was then filed on February 13, 2020.

{¶ 13} On February 25, 2020, the court dismissed Mother's objections because she never filed the transcript. As a result, the court made the December 18, 2020 custody decision the court's order.

{¶ 14} A semi-annual review ("SAR") was filed on April 15, 2020. According to the SAR, Mother had done a drug and alcohol assessment and was seeing a nurse and therapist weekly. An agency screen done in the last 90 days revealed that Mother had tested positive for methamphetamines. On two court screens, Mother had tested positive for methamphetamines on one and positive for amphetamines on the other. SAR (April 15, 2015), p. 6. GCCS assessed the risk as high due to R.V. and Mother both testing positive for methamphetamines and refusing to submit to drug screens. *Id.* at p. 12.

{¶ 15} On August 31, 2020, GCCS filed a motion for a first extension of temporary custody. According to the motion, Mother had completed a drug and alcohol assessment and was seeing a therapist at Path Integrated Health ("Path") for substance abuse assessment and therapy. The motion further stated that both Mother and R.V. had

tested positive for methamphetamines and amphetamines on random drug screens, but they had denied illegal drug use. In addition, the motion stated that Mother needed to maintain sobriety, maintain employment and housing, complete mental health and substance abuse treatment until completed, complete parenting/psychological evaluations and follow all recommendations, and test negative on all drug screens. On the same day the extension request was filed, the court scheduled a September 24, 2020 hearing on that matter.

{¶ 16} On September 16, 2020, Mother filed a motion seeking legal custody and to modify her parenting time. The magistrate filed a decision on September 25, 2020, noting that while Mother's initial substance abuse assessment had indicated no need for treatment, she had since tested positive for methamphetamine three times. Magistrate's Decision (Sept. 26, 2020), p. 1. Mother's August 28, 2020 drug screen was negative, and R.V.'s July 24, 2020 drug screen indicated that he had tested positive for methamphetamine. *Id.*

{¶ 17} The magistrate further noted that the visitation of both Mother and R.V. at the Visitation Center had been cancelled due to their behavior, and that the foster parents had been facilitating visitation. *Id.* at p. 2. The magistrate granted GCCS's motion for an extension of temporary custody and set a hearing for December 4, 2020 on Mother's motion for custody. A review hearing was also set for February 25, 2021.

{¶ 18} Subsequently, the December 4, 2020 hearing was continued until February 24, 2021, at Mother's request. On February 4, 2021, GCCS filed a second and final motion for an extension of temporary custody. The motion noted various facts, including

that Mother had had a positive drug screen for methamphetamine and amphetamines on December 1, 2020, and had been resistant to engaging in drug screens for GCCS. R.V. had also tested positive for these substances on December 1, 2020. In addition, both parents had not completed many therapy sessions. The motion alleged that R.V. and Mother needed to engage in therapy and to be available for random drug screens and produce negative results. The court scheduled this motion to be heard at the same time as Mother's motion for legal custody.

{¶ 19} After the February 24, 2021 hearing, the magistrate filed a decision granting a final extension of custody to GCCS. The magistrate noted that all parties had agreed that an extension of temporary custody was in the children's best interests. Magistrate's Decision (Feb. 24, 2021), p. 1. A review hearing was set for August 12, 2021.

{¶ 20} An SAR filed on April 1, 2021 noted that Mother was only minimally participating in services, had only recently admitted to her drug use despite three positive screens, and did not recognize the impact her drug use had on her children. Furthermore, despite repeated requests, the agency had not been able to obtain records of the frequency or type of Mother's engagement in counseling. Therefore, insufficient progress had been made towards reunification. SAR (Apr. 1, 2021), p. 3. At that time, the protective order had been modified to remove K.P., and she had been placed with her father, B.P., on an extended visit. At that point, the agency was hoping to reunify K.P. to her father's home.

{¶ 21} On May 18, 2021, GCCS filed a motion asking the court to order Mother to submit to a 10-panel hair or nail toxicology screen. GCCS stated in the motion that it

had tried to administer drug screens once a week since the February 24, 2021 hearing, but Mother had failed to cooperate. Mother also had not responded to GCCS's offer to set up a 10-panel hair or nail toxicology screen. On May 26, 2021, the magistrate ordered Mother to appear for such a toxicology screen on or before July 12, 2021. On the same day, Mother's counsel filed a motion seeking to withdraw as counsel and asked that counsel be appointed for Mother. The motion was granted, and Mother was notified of her right to appointed counsel if she completed an affidavit of indigency.

{¶ 22} On May 27, 2021, Mother filed a pro se complaint in contempt against two GCCS caseworkers, alleging that they had violated the court's visitation orders. On July 12, 2021, GCCS filed a motion requesting modification of temporary custody to permanent custody for C.L. and K.V. Among other things, GCCS contended that Mother had failed to submit to a drug screen, had not obtained employment, and had failed to follow through with remaining case plan requirements. Mother then filed another pro se contempt complaint against the caseworkers on July 15, 2021, alleging they had interfered with visitation. The court scheduled the contempt motions for hearing on August 3, 2021.

{¶ 23} On July 29, 2021, the court scheduled a permanent custody hearing for October 19, 2021, and appointed counsel for Mother and R.V. The court also stated that a guardian ad litem ("GAL") for the minor children would be appointed through the CASA program.

{¶ 24} Following the August 3, 2021 contempt hearing, the court denied Mother's contempt motion because the Visitation Center had suspended Mother's visitation for

violating the rules. GCCS had also modified Mother's visitation due to a positive test for methamphetamine in July 2021. Furthermore, Mother had not fully engaged in case plan services. Magistrate's Decision (Aug. 11, 2021), p. 1. After a review hearing on August 12, 2021, the court maintained GCCS's temporary custody pending the outcome of the permanent custody hearing.

{¶ 25} No objections were filed to the August 11, 2021 contempt decision. On October 12, 2021, the GAL filed a report recommending that permanent custody of C.L. and K.V. be granted to GCCS. The same day, GCCS filed a motion asking the court to order Mother and R.V. to submit to toxicology screens. GCCS noted that Mother had refused to comply with the last order requiring her to have a screen by July 12. 2021, and that she had stated at the August 2021 contempt hearing that she had refused to comply due to her right against "self-incrimination." Motion for Court Order of Toxicology Screen (Oct. 12, 2021), p. 3.

{¶ 26} GCCS further noted that it had been able to test Mother on July 7, 2021, and the test was positive. *Id*. at p. 4. R.V.'s screen, taken on May 13, 2021, was positive for multiple substances. *Id*. at p. 4. However, while both parties had been asked since to provide drug screens, they had not cooperated. *Id*. As a result, GCCS asked the court to require Mother and R.V. to submit to hair or nail follicle tests with ARC Point Labs. *Id*. at p. 5. The judge granted the request on October 13, 2021, and ordered Mother and R.V. to submit to a 10-panel hair follicle or nail follicle test with ARC Point Labs by October 14, 2021. Also on October 13, 2021, Mother filed a pro se motion seeking a reallocation of parental rights and to modify the temporary custody of K.P.

This motion was scheduled for a hearing on October 19, 2021.

{¶ 27} On October 18, 2021, 2021, GCCS asked to continue the October 19, 2021 hearing, due to developments with K.P., who had been living with her father, B.P. Specifically, B.P. had been arrested and detained for disorderly conduct on October 16, 2021, and K.P. had been temporarily moved to her older brother's home. As a result, GCCS had filed a motion on October 18, 2021, seeking permanent custody of K.P. The court then reset the hearing for November 23, 2021.

{¶ 28} On October 21, 2021, the court appointed the same GAL for K.P. as had previously been appointed. The court also scheduled GCCS's motion for modification of K.P.'s temporary custody to permanent custody to be heard on November 23, 2021. Judgment Entry, Case No. 2019-C-00015 (Oct. 21, 2021), p. 1.

{¶ 29} The GAL filed a report on November 18, 2021, regarding K.P. In the report, the GAL discussed K.P.'s difficult situation while living with B.P., her refusal to allow anyone to adopt her, K.P.'s wish to live with Mother, the negative effects of the constant turmoil while K.P. was in Mother's home, K.P.'s age, and the potential detrimental effect of constant changes in foster homes and schools. GAL Report and Recommendations, Case No. 2019-C-00015 (Nov. 18, 2021), p. 5. Given these factors, the GAL was indecisive at that point as to a recommendation. *Id.* On its own motion, the court appointed an attorney to represent K.P.

{¶ 30} A permanent custody hearing was held on November 23, 2021, and was continued due to the need for additional time. The GAL then filed an updated report on K.P. on January 28, 2022. At that time, the GAL was still indecisive but indicated that

K.P.'s personality had changed after spending time with Mother and R.V. at Christmas. Before going there, K.P. had been social and cooperative; after, she was "non-social, disrespectful, and defiant." GAL Report and Recommendations, Case No. 2019-C-00015 (Jan. 28, 2022), p. 1. Furthermore, a two-year-old in the foster home had found a "vape" in K.P.'s hat. *Id.* The GAL also noted that a package sent by R.V. to K.P. at the foster home before Christmas "contained a Survival Kit that included a knife." *Id.* On the same date, the GAL filed an updated report about K.V. and C.L. and recommended that GCCS be granted permanent custody. Among other things, the GAL noted negative remarks R.V., Mother, and K.P. had made about the foster mother when C.L. was present.

{¶ 31} On March 28, 2021, another updated GAL report was filed, again recommending that permanent custody of C.L. and K.V. be granted to GCCS. Further custody hearings were held on April 5, April 13, May 26, and June 10, 2022.

{¶ 32} On April 22, 2022, GCCS filed a motion to modify temporary custody of K.P. to a PPLA. On May 31, 2022, the court granted Mother's motion for in camera interviews with K.P. and C.L., and set the interviews for June 9, 2022.

{¶ 33} During the five custody hearings, the court heard testimony from the following individuals: (1) the Greene County Visitation Center coordinator; (2) a GCCS caseworker; (3) a GCCS supervisor; (4) Dr. Bromberg (who had psychologically evaluated all the parents); (5) the GAL (who recommended permanent custody for C.L. and K.V. and a PPLA for K.P.); (6) a scientist who verified drug screen results for Mother and R.V.; (7) Mother; and (8) R.V. After the hearings, the court filed a judgment entry

and orders on July 22, 2022, granting permanent custody of C.L. and K.V. to GCCS. The court also placed K.P. in a PPLA with GCCS. Mother timely appealed from the court's decision, but no other party has appealed.

## II. Weight of the Evidence

{¶ 34} Mother's sole assignment of error states that:

> The Trial Court's Decision to Grant the Motions for Permanent and Legal Custody to GCCS Was Not in the Children's Best Interest, and Was Against the Manifest Weight of the Evidence.

{¶ 35} Under this assignment of error, Mother contends that she made reasonable efforts to comply with her case plan, and that the trial court abused its discretion in finding that permanent custody was in the best interests of C.L. and K.V. and that a PPLA was in K.P.'s best interest. Before addressing these points, we will outline the standards that generally apply in cases involving termination of parental rights.

## A. General Standards

{¶ 36} "The United States Supreme Court has stressed that parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by this Court.' " *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). Ohio has also said that "parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.* at ¶ 19, quoting *In re Perales*, 52

Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.)

{¶ 37} Nonetheless, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974). "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *B.C.* at ¶ 20.

{¶ 38} As relevant here, under R.C. 2151.414, "courts use a two-part test when deciding motions seeking an award of permanent custody to a public services agency. This statute requires courts to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) * * * the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14, citing *In re K.M.,* 8th Dist. Cuyahoga No. 98545, 2012-Ohio-6010, ¶ 8. *See also* R.C 2151.414(B)(1)(a)-(d).

{¶ 39} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in

the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶ 40}** Here, there is no dispute that the children were in GCCS's custody for 12 or more months of a consecutive 22-month period. Consequently, the issue for review is whether granting permanent custody (and in the case of K.P., a PPLA) was in the children's best interests. The factors that apply to this issue are found in R.C. 2151.414(D), which we will consider in greater detail below.

**{¶ 41}** "Decisions on terminating parental rights 'will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established.' " *In re L.R.B.*, 2d Dist. Montgomery No. 28826, 2020-Ohio-6642, ¶ 47, quoting *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "We review the court's judgment on this matter for abuse of discretion." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (which applied an abuse of discretion standard to the trial court's findings under R.C. 2151.414).

**{¶ 42}** " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), citing *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87, 482 N.E.2d 1248 (1985). "[M]ost instances of abuse of discretion will result in decisions that are simply unreasonable," rather than being

"unconscionable or arbitrary." *Id.*

{¶ 43} Furthermore, "[t]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Specifically, since "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.* However, this discretion, while broad, is "not absolute" and is guided by statutory language. *Id.*

{¶ 44} Guided by all these principles, we will now consider whether the court's decision concerning the children's best interests was supported by clear and convincing evidence.

### B. Application of R.C. 2151.414(D)

{¶ 45} "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need

for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, at ¶ 15. "No one element is given greater weight or heightened significance." *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. To evaluate the court's decision, we will consider these statutory factors.

### 1. Child's Interaction with Others

{¶ 46} R.C. 2151.414(D)(1)(a) considers a child's interaction and relationship with various people, including parents, relatives, and foster caregivers. The trial court found K.P.'s relationship with Mother was detrimental to K.P., because K.P. acted in the role of a parent, Mother had improperly discussed the case with K.P., and Mother did not follow rules relating to contact with K.P. Judgment Entry & Orders of Permanent Custody (July 22, 2022) ("Judgment Entry"), p. 6-7. We agree.

{¶ 47} As a preliminary point, we note that we have reviewed the record, including the docket, hearing transcripts, and exhibits, and find that Mother's testimony lacked credibility, even under our more limited ability to view witnesses. For example, despite documented drug screens that were positive for methamphetamines and amphetamines throughout the case, Mother claimed that the results were based on improper test administration, were incorrect, or had improper cutoffs for disclosure of drugs. Transcript of Proceedings (May 26, 2022) ("Tr. 4"), p. 177-179, 180, 181, and 190. Mother even

accused GCCS of manipulating records.   *Id.* at p. 187-188.

{¶ 48} Mother also claimed she followed agency rules and was being punished when she had done nothing wrong.   *Id.* at p. 183 and 193.   However, this was untrue. Among other things, Mother's visitation at the Visitation Center was terminated because she failed to follow visitation center rules.   Mother also admitted to using fake urine for a drug test, and Mother let K.P. come to her house for visitation without the agency's knowledge or approval for significant amounts of time when K.P. was staying with her father.   *Id.* at p. 145-146, and 189-190; *see also* Transcript of Proceedings (November 23, 2021) ("Tr. 1"), p. 11-12, 19-20, and 23-24, and State's Ex. 1 and 2 (Visitation Center Reports to the trial court for periods from January 2, 2020 through August 20, 2020, which ended in termination of Mother's visitation at the Center).

{¶ 49} In addition, at the June 10, 2022 hearing, Mother had an almost complete lack of recollection of an incident where the police were called to her home only six months earlier, i.e.. in January 2022.   *See* Transcript of Proceedings (June 10, 2022) ("Tr. 5"), p. 5-7, and Transcript of Proceedings (April 5, 2022) ("Tr. 2), p. 134.   R.V. had a similar lack of recollection, even though the incident allegedly involved Mother's hitting R.V. in the face while he was sleeping and accusing him of taking money from her.   Tr. 5 at p. 44-49.   Mother even denied that a magistrate had ordered her in mid- or late 2021 to submit to a hair or nail follicle drug test.   *Id.* at p. 11.   However, the May 26, 2021 magistrate's order to that effect (and requiring Mother to submit to a 10-panel hair or nail follicle drug test by July 12, 2021) is in the court file.   Magistrate's Order (May 26, 2021), p. 1.   As previously noted, the court also ordered Mother to take such a test on October

13, 2021.

{¶ 50} Also, contrary to Mother's claims, K.P. herself expressed concern to the GAL about acting as a parent to her siblings.   Tr. 4 at p. 65.   There is also evidence in the record about Mother's inappropriate behavior, including discussing the case in front of her children and abuse of staff or complaints about the agency in front of her children and other families at the Visitation Center.   Evidence was also presented concerning K.P.'s desensitization about what it was like to be in abusive and neglectful situations due to her past experiences living with Mother.   Transcript of Proceedings (April 13, 2021) ("Tr. 3") p. 52-53; Tr. 1 at p.12; State's Ex. 1, p. 6-7, 8, and 9; and State's Ex. 2, p. 6-7. In addition, R.V. said inappropriate things in front of the children and was abusive to the Visitation Center staff.   Tr. 1 at p. 13; State's Ex. 1, p. 6 and 10-11.

{¶ 51} The trial court noted that the children were bonded to each other and to Mother and R.V., that K.P. did not want to be around her father, B.P., and that there were no other individuals who were relevant.   We agree with this assessment of the evidence, but we also agree with the court that the presence of a bond does not outweigh the harmful effects that Mother and R.V. had on the children due to their persistent substance abuse problems and failure to address or even recognize how their actions impacted the children.

## 2.   The Child's Wishes

{¶ 52} R.C. 2151.414(D)(1)(b) concerns "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the

maturity of the child." Concerning this factor, the trial court noted that K.P. did not want to live with her father (B.P.) and did want to return to Mother. However, the court felt a PPLA would be in K.P.'s best interest because it would let her have contact with Mother but would also relieve her from the harmful potential arising from Mother's substance abuse. Judgment Entry at p. 8. As noted above, evidence in the record supported this conclusion. Likewise, the court was concerned about the effect of Mother's substance abuse on the younger children. *Id.* at p. 9. This, in fact, was the overriding concern in the case – something neither Mother nor R.V. ever acknowledged.

{¶ 53} Dr. Bromberg, a clinical psychologist, performed an evaluation on Mother in April 2020 and also testified at trial. GCCS referred Mother to Dr. Bromberg for assessment of her psychological and parental functioning. Tr.1 at p. 42 and 45. Dr. Bromberg concluded that Mother "is at high risk of relapse into serious drug abuse and dependence, and * * * she is also at high risk of dying from drug abuse or drug-assisted suicide." State's Ex. 3, p. 17. During his testimony, Dr. Bromberg noted Mother's serious mood issues, anger, and volatility (by her own account), chronic extensive substance abuse problems, serious legal problems, and lack of appreciation about the severity and dangerousness of her problems. The doctor expressed great concern about these issues. Tr. 1 at p. 54-55.

{¶ 54} According to the background information Mother gave Dr. Bromberg, she began alcohol use at age 30, and her drinking picked up after her brother's murder in 2009. Mother then began using Vicodin in 2011 and stated that, at her highest use: "[I] was getting 10 mg Vicodins ('school buses') and I could eat four at a time. They were

$10 per pill and it got very expensive. I sold pain pills to feed my addiction." State's Ex. 3 at p. 6.[1]

{¶ 55} C.L., who was born in 2014, was born "in withdrawal and was seizing at birth." *Id.* Mother went home without C.L. By Mother's account, she "overdosed" on pills the hospital had given her and then tried heroin because "it did the job so much faster. It made me feel so much better and was cheap." *Id.* Mother then said:

I had the fastest downward spiral in the history of drug addicts. * * * I did

heroin for 1-1/2 years. I was arrested on 12/15/15 for attempting to get

money for my addiction. The devil had a hold on me."

State's Ex. 3 at p. 6.

{¶ 56} After being released from jail in 2015, Mother tried Suboxone for a few weeks, but it was too expensive. She quit because she "wanted to get high." *Id.* Mother then stated to Dr. Bromberg that she had last used drugs on March 22, 2016, "the day she 'shot up heroin probably laced with Fentanyl and was dead for 45 minutes' after her children were removed from her care." *Id.* After being convicted of theft in 2016, Mother spent seven months in the Greene County Jail and served the rest of her 18-month sentence at Marysville Correctional Institution. *Id.* at p. 5. She was released in June 2017. *Id.* At that point, K.P. would have been around 11 years old – having been exposed at that point to many years of her mother's addictive behavior, 18 months of her mother's absence while imprisoned, and time spent in foster care.

{¶ 57} A little over two years after her release from jail, Mother gave birth to K.V.,

---

[1] In 2011, K.P. would have been around five years old.

at which time she tested positive for amphetamines, and K.V.'s cord blood tested positive for methamphetamine and amphetamines.

{¶ 58} When Mother saw Dr. Bromberg in April 2020, she "self-reported" that she was in early remission from opioid use. However, Mother had tested positive for drug use in January 2020 and in July 2020. Tr. 2 at p. 197-198; Tr. 3 at p. 106-107; State's Ex. 12; and State's Ex. 3, p. 13. As we previously noted, Mother failed to comply or cooperate with many attempts to obtain drug screens throughout the case.

{¶ 59} Dr. Bromberg diagnosed Mother as having severe opioid use disorder and a disruptive mood dysregulation disorder. He recommended: random drug testing for 24 months; outpatient drug treatment weekly for 12 months; a psychological evaluation to determine psychotropic medication and recommendations; specialized treatment in personality disorder treatment; weekly dialectal behavior therapy ("DBT") as well as individual psychotherapy for 24 months; anger management training weekly for six months; and parental skills training weekly for 12 months. Tr. 1 at p, 58, and State's Ex. 3 at p. 13.

{¶ 60} Throughout this case, however, Mother continued to test positive, minimized her drug issues, and never successfully completed treatment. Clearly, GCCS, the GAL, and the trial court were rightly concerned about Mother's persistent substance abuse, how it had harmfully affected (and could continue to harmfully affect) all her children, and Mother's failure to recognize these serious problems.

{¶ 61} Dr. Bromberg also examined R.V. in April 2020. At that time, R.V. reported an extensive history of very serious substance use, a chronic history of very serious legal

problems and criminal behaviors, and a history of dysfunctional relationships. State's Ex. 4, p. 17, and Tr. 1 at p. 64. In responding to psychological testing, R.V. indicated that he had been "very physically aggressive toward people, had hurt people, had stolen from people, robbed them, and that he was a threat, aggressively, to other people." Tr. 1 at p. 64-65. Consistent with Mother's account of her own "remission," R.V. told Dr. Bromberg that he had ended his previous use of drugs in January 2020. Ex. 4 at p. 17. Again, however, R.V. tested positive for methamphetamines and amphetamines in January 2020 and July 2020, failed to comply or cooperate with drugs screens, and tested positive for illegal substances throughout the case. *See* Tr. 3 at p. 108-113; State's Ex. 13; and Tr. 5 at p. 59. The agency's concern about drug use and placing young children in the home with these parents began at the beginning of the case and never abated. Tr. 2 at p. 231.

{¶ 62} In this vein, the GCCS supervisor who had been involved with the case testified:

The concerns are that throughout the entirety of the case, neither [R.V.] or [Mother] has recognized the need for the removal and have consistently insisted that [GCCS] return the children and that there's no issues, that they were perfect parents, and completely discount the drug use in the home.

They – for months and months, [Mother] didn't even admit to any drug use, and so just the fact that they wouldn't even address these concerns, and so not taking accountability, not understanding the impact

this has on small children and what risk it could put them at is very concerning."

* * *

[T]hey have not been able to demonstrative nor been cooperative to want to demonstrate sobriety for any length of time, or stability, and for these reasons, we would be extremely concerned, especially putting the younger children back in the home.

Tr. 2 at p. 231-232.

{¶ 63} Given these points, we agree with the trial's concern over the impact of the substance abuse issues on C.L., K.V., and K.P.

### 3. Custodial History

{¶ 64} R.C. 2151.414(D)(1)(c) considers a child's custodial history, which includes whether a child has been in an agency's temporary custody for 12 or more months of a consecutive 24-month period. As previously noted, the children have been in GCCS's temporary custody for the required time.

{¶ 65} In discussing this factor, the trial court again focused on the parents' drug problems and their failure to either cooperate or address the problems. These observations were supported by the evidence. Regarding K.P., the court noted that her father's (B.P.'s) issues prevented him from being a permanent placement option and that B.P. had been placed in jail after K.P. was removed. Mother has not suggested that B.P. was an appropriate option for K.P.'s care; in fact, based on Mother's conduct throughout

the case, Mother is very opposed to any involvement by B.P. in his daughter's life.

### 4. Need for Legally Secure Placement

{¶ 66} R.C. 2151.414(D)(1)(d) involves "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." Concerning this factor, the trial court found clear and convincing evidence that the needs of K.P., C.L., and K.V. could not be achieved without granting permanent custody to GCCS. Judgment Entry at p. 10. The court stressed several points, including Mother's failure to complete her case plan objectives and "inability to recognize that she must participate in and complete mental health counseling, that she must maintain some contact with GCCS and must show that she can consistently attend substance abuse counseling." *Id.* The court also noted that Mother and R.V. had refused to submit to hair follicle testing three times, despite being ordered by the court to do so. *Id.* Furthermore, the court focused on Mother's inability to recognize the role she played in the issues causing K.P.'s trauma and its concern about Mother's ability to protect K.P. and maintain a stable and safe home for her children. *Id.*

{¶ 67} In addition, the court discussed in detail Dr. Bromberg's findings for all three parents and the continued positive tests for drug abuse, all of which indicated by clear and convincing evidence that the children could not be placed with any parent. *Id.* at p. 10-13. No placements with relatives were available, either. *Id.* at p. 10. Again, competent, credible evidence supports the court's findings.

{¶ 68} Finally, the court found that K.P.'s best interest was not to give GCCS

permanent custody and that adoption was not feasible due to K.P.'s resistance. However, due to the parents' issues, K.P. could not be placed in their care. Therefore, PPLA was appropriate, and GCCS could provide the needed permanency for K.P. *Id.* at p. 12. Again, based on our discussion, the court's decision was supported by competent, credible evidence.

### 5. Applicability of Factors in R.C. 2151.414(E)(7) to (11)

{¶ 69} R.C. 2151.414(D)(1)(e) requires courts to consider whether any factors in R.C. 2151.414(E)(7) to (11) apply. These factors refer to matters like prior convictions for various crimes involving the child, the child's siblings, or a former child living in the parents' home; parental withholding of food or medical treatment; a parent's rejection of certain specified drug or alcohol abuse treatment; parental abandonment of the child; and a parent's prior involuntary termination of parental rights. The trial court did not make explicit findings on these points but stated that it had considered them. Judgment Entry at p. 13.

{¶ 70} The Supreme Court of Ohio has said that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e)." *In re A.M.,* 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31. The court further stressed that:

> Consideration is all the statute requires. Although a reviewing court must
> be able to discern from the magistrate's or juvenile court's decision and the
> court's judgment entry that the court satisfied the statutory requirement that

it consider the enumerated factors, we may not graft onto the statute a requirement that the court include in its decision a written discussion of or express findings regarding each of the best-interest factors.

*Id. Accord In re Z.D.Y.*, 2d Dist. Greene No. 2022-CA-37, 2022-Ohio-4115, ¶ 83, citing *A.M.* at ¶ 31 (noting that in the case before it, "the court stated that it had considered all the factors, and that was sufficient").

**{¶ 71}** Based on the preceding discussion, the trial court did not abuse its discretion in terminating Mother's parental rights with respect to C.L. and K.V. or in ordering a PPLA for K.P. The court's decision was supported by competent, credible evidence. Accordingly, Mother's sole assignment of error is overruled.

## III.   Conclusion

**{¶ 72}** Mother's assignment of error having been overruled, the judgments of the trial court are affirmed.

. . . . . . . . . . . .

TUCKER, P.J. and EPLEY, J., concur.