[Cite as *In re H.V.F.*, 2024-Ohio-5838.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN RE: H.V.F. | : |
| | : |
| | :    C.A. No. 30183 |
| | : |
| | :    Trial Court Case No. C-2021-003617-0L |
| | : |
| | :    (Appeal from Common Pleas Court- |
| | :    Juvenile Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on December 13, 2024

. . . . . . . . . . .

KRISTIE GOTWALD, Attorney for Appellant

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant D.B. ("Father") appeals from a judgment terminating his parental rights with respect to his daughter, H.V.F. According to Father, the judgment was against the manifest weight of the evidence because he had substantially completed all his case plan requirements and reunification was possible within a reasonable time.

Mother did not appeal or file a brief. However, in response to a show cause order, Mother said she supports Father's appeal and his effort to obtain custody of H.V.F.

{¶ 2} Our review indicates that ample evidence existed to support the judgment, and it therefore was not against the manifest weight of the evidence. Accordingly, Father's assignment of error is without merit, and the trial court's judgment will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} In August 2021, Montgomery County Children Services ("MCCS") filed a complaint in juvenile court alleging that H.V.F. was a dependent child. At the time, H.V.F. was only four months old. The complaint raised many concerns, including Mother's mental health, the child's failure to thrive, and the fact that another child of Mother, H.L., had been adjudicated as dependent in April 2021. In addition, the complaint noted historical concerns about Mother's substance abuse, domestic violence with her then-husband, and other issues. Due to these problems, four of Mother's other children had been adjudicated dependent in 2015 and placed in their grandmother's legal custody. The complaint further noted that H.V.F.'s "legal" father, S.W., and her alleged father, D.B., had not been in contact with MCCS. MCCS requested an order of protective supervision or temporary custody.

{¶ 4} Another complaint was filed several days later, adding that MCCS had received reports that Mother had been taken to the hospital for hallucination. When MCCS met with Mother, she reported that she did not have anyone to watch the children;

as a result, the police were called and gave MCCS emergency custody of H.L. and H.V.F. The current appeal involves only H.V.F., however.

{¶ 5} The court appointed a guardian ad litem ("GAL") for H.V.F. and also appointed counsel for Mother. At a hearing held on August 24, 2021, the court granted interim temporary custody to MCCS and filed an order to that effect. The court set an IAH(CIC) hearing for October 19, 2021, and an adjudication and disposition hearing for November 21, 2021. During the October hearing, Mother stipulated to the facts in the complaint and to the adjudication of dependency under R.C. 2151.04(B), (C), and (D). Magistrate's Interim Order (Oct. 19, 2021), p. 1.

{¶ 6} Prior to the November 21 hearing, the GAL filed a report recommending that the court award temporary legal custody to MCCS. At that time, the GAL had not observed Father with H.V.F., as he had no scheduled visitation and had not participated in the investigation. 2nd GAL Report to the Court (Nov. 12, 2021), p. 1. After the hearing, the court granted MCCS temporary custody of H.V.F. and set a dispositional review hearing for February 8, 2022. MCCS then filed a case plan in late November 2021. At that time, MCCS had set various goals for Mother, but Father was not yet involved.

{¶ 7} In December 2021, MCCS filed a semi-annual review, noting, among other things, that H.V.F. had been born prematurely and was behind developmentally. H.V.F. was linked with Help Me Grow, received physical therapy, attended the Neonatal Abstinence Syndrome ("NAS") Clinic, and had a scheduled appointment with a developmental pediatrician in February 2022. Semi-Annual Review ("SAR") (Dec. 17,

2021), p. 2. At that time, Mother had made limited progress on her case plan, and Father had not been in contact with MCCS. *Id.* at p. 5.

{¶ 8} In late January 2022, the GAL filed another report expressing concern that Mother had missed visitation. More concerning, she had missed medical appointments for H.V.F., who had substantial medical needs. 3rd GAL Report (Jan 28, 2022), p. 5. The GAL recommended that MCCS retain temporary legal custody and that Mother's visitation continue at the agency and be supervised. *Id.* Again, Father had not been observed with H.V.F. *Id.* at p. 1. At the February 2022 review hearing, the court ordered that all November 2021 orders remain in effect until disposition. The court also set a further review hearing for July 26, 2022.

{¶ 9} Before that July review hearing, however, MCCS filed a motion seeking permanent custody of H.V.F. In the motion, MCCS alleged: (1) S.W. had been found not to be H.V.F.'s legal father and had been removed as a party; (2) Mother was inconsistent with visitation and had not made significant progress on her case plan; and (3) Father had not contacted MCCS and was not visiting H.V.F. The GAL then filed another report recommending that permanent custody be granted to MCCS. *See* 4th GAL Report (July 18, 2022), p. 4. During the July 26 hearing, Father appeared for the first time. At that time, the court noted that Father had initiated a paternity action, but genetic testing had not been completed. Father had also recently been released from prison and had not yet had any visits scheduled with H.V.F. The court then set trial for October 21, 2022. Magistrate's Interim Order (July 27, 2022), p. 2-3. On September 26, 2022, the court appointed counsel for Father.

{¶ 10} In early October 2022, MCCS filed an amended case plan, which outlined objectives for Father. These included: completing a dual assessment for mental health and substance abuse and following providers' recommendations; completing Batterer's Intervention and refraining from engaging in domestic violence relationships; complying with the MCCS caseworker and signing releases of information as the agency and providers required; obtaining and maintaining legal income to meet H.V.F.'s needs and providing proof of paystubs to the agency; maintaining housing and providing a copy of the lease to the agency; complying with all parole terms and conditions; completing parenting classes and demonstrating learned skills; visiting with H.V.F. once a week to establish a bond; and attending all the child's medical appointments. Case Plan (Oct. 4. 2022), p. 3.

{¶ 11} At this time, the GAL again recommended that the court grant permanent custody to MCCS, but he did say he would supplement the report after meeting with Father. *See* 5th GAL Report (Oct. 4, 2022). At Father's request, the court continued the permanent custody trial until January 7, 2023. Father then filed a motion seeking legal custody of H.V.F., or alternatively, temporary custody.

{¶ 12} A December 2022 SAR stated that Father had a history of domestic violence with Mother, had an extensive criminal history, struggled with stress and anger, had spent 29 years in prison for violent crimes, and was then on parole. Father had also admitted that he smoked marijuana daily and struggled with mental health. SAR (Dec. 14, 2022), p. 3. Father had made some progress on the case plan, as he had completed parenting classes and was attending weekly therapy sessions. Father had just begun

supervised visits in October, and the child was uncomfortable with him. Father also left visits early. *Id.*

{¶ 13} Due to witness unavailability, the court continued the permanent custody trial to April 12, 2023. Shortly before trial, the GAL supplemented his report. *See* 5th GAL Report, Supplemented (Apr. 5, 2023). In the report, the GAL recounted Father's extensive prison history. The GAL further noted that Father had been diagnosed with marijuana and cocaine dependency, had admitted to daily marijuana use, and had tested positive for marijuana at the agency. Furthermore, Father had been arrested on January 18, 2023, for trafficking in drugs. The police report indicated that several individually packaged baggies of marijuana had been found in Father's car. *Id.* at p. 5. The GAL concluded that H.V.F.'s safety was at risk with both parents and again recommended that the court grant permanent custody to MCCS. *Id.* at p. 8-9.

{¶ 14} After holding the scheduled permanent custody hearing in April 2023, the magistrate filed a decision finding that MCCS had met its burden of establishing several grounds for permanent custody in R.C. 2151.414(E), and that an award of permanent custody would be in H.V.F.'s best interest. Magistrate's Decision and Judge's Order (May 30, 2023). Due to various service issues, Father's objections to the decision and MCCS's response were not completed until early February 2024. The trial court then issued a decision overruling the objections and concluding that permanent custody should be granted to MCCS. Judge's Final Appealable Order ("Order") (May 20, 2024). Father timely appealed from the court's decision.

## II. Manifest Weight of the Evidence

**{¶ 15}** Father's sole assignment of error states that:

The Trial Court's Findings of Facts and Decision That Permanent Custody Should Be Granted to the Agency Are Against the Manifest Weight of the Evidence.

**{¶ 16}** Under this assignment of error, Father contends that the trial court's custody decision was against the manifest weight of the evidence because he had substantially completed his case plan. The goals included having clean and suitable housing, having sufficient income, and consistently attending visitation. In addition, while not assigning these points as separate assignments of error, Father argues that the trial court improperly relied on a "non-existent" domestic violence charge; that his criminal history should not disqualify him from parenthood, since he is "older, more mature and has an incentive to avoid recidivism"; and that he is a suitable parent and should not be denied custody simply because the foster parents desire to adopt H.V.F. Father's Brief, p. 11-19. Before we address Father's claims, we will outline the relevant review standards.

## A. Review standards

**{¶ 17}** The standards that apply in reviewing decisions on permanent custody of children and termination of parental rights are sufficiency of the evidence and manifest weight of the evidence. *In re Z.C.*, 2023-Ohio-4703, ¶ 1. Here, Father has asserted only manifest weight, and that is what we will consider. When an appellate court reviews for manifest weight, it "must weigh the evidence and all reasonable inferences, consider

the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 18} "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21. The underlying rationale for deferring to trial court findings " 'rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Z.C.* at ¶ 14, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). " ' "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." ' " *Id.*, quoting *Seasons Coal* at 80, fn. 3. (Other citation omitted.)

## B. Discussion

### 1. Applying Required Statutory Findings for Granting Permanent Custody – R.C. 2151.414(B)(1) and R.C. 2151.414(E)

{¶ 19} Under R.C. 2151.414(B)(1), a court may grant permanent custody to an agency if it finds by clear and convincing evidence that this is in the child's best interest and that one of the five conditions in subsection (B)(1)(a)-(e) apply. The condition the trial court relied on here is R.C. 2151.414(B)(1)(a), which provides that a court may grant

permanent custody if "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." Under R.C. 2151.414(E), this finding can be made if the court finds that any one of 16 listed factors applies.

{¶ 20} In this case, the trial court found by clear and convincing evidence that R.C. 2151.414(B)(1)(a) and R.C. 2151.414(E)(1) applied to both Mother and Father. Order at p. 2-3 and 5. The court further found that R.C. 2151.414(E)(2) applied to Mother, R.C. 2151.414(E)(4) applied to both parents, and that R.C. 2151.414(E)(13) applied to Father. *Id.* at p. 6-7. We will consider only the factors relating to Father, as Mother did not appeal.

{¶ 21} R.C. 2151.414(E)(1) applies if, "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." In addition, R.C. 2151.414(E)(1) states that in deciding if the parents "have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."

{¶ 22} In this regard, the trial court considered Father's case plan and made the following observations: (1) Father had completed initial drug treatment, but shortly after screened positive for marijuana. He was asked to reengage in treatment but failed to do

so; (2) the agency was also concerned about Father's alcohol use, as he reported using it in the absence of marijuana and drank about two beers per day; (3) Father was on parole for burglary and failed to comply with parole conditions; (4) while Father's housing was clean and appropriate, Father's girlfriend lived there, had a criminal background, and had not come to MCCS to be fingerprinted; (5) Father claimed to be employed, but MCCS had not received pay stubs and did not believe his income was sufficient; and (6) observation of Father's visit with H.V.F. revealed that he did not listen to her when she said she did not want to be near him and had to be redirected. H.V.F. was nervous around Father at the beginning of visits but eventually calmed down and interacted with him. Order at p. 4-5.

{¶ 23} Concerning the court's findings, we note the following facts. The MCCS caseworker, Katie, testified at the custody hearing. Katie had been assigned to the case (which also involved an older sibling, H.L.), since December 2020. This was before H.V.F. was born. Both children were removed from Mother's care in August 2021, and MCCS originally placed them in the same foster home. However, MCCS removed H.L. a few months later and placed her in a different foster home due to her behaviors and tantrums. Since being removed from Mother's home, both children were continuously in MCCS's custody and in foster care. Transcript of Proceedings ("Tr."), 84-85.

{¶ 24} Katie discussed the case plan with Father once he became involved in October 2022. She asked Father to complete a batterer's program due to his criminal history and domestic violence. He had nearly completed this program at the time of the permanent custody hearing. Katie requested the batterer's program because Father had

been charged with domestic violence in 1997 and also in August 2021. *Id.* at 102-103, 124-125, 147, and 164.[1]

{¶ 25} Father had also completed a mental health and substance abuse assessment and had successfully completed the substance abuse treatment in January 2023. However, Father was drug-screened shortly thereafter at visitation due to reports of what appeared to be marijuana falling out of his pocket and the smell of marijuana on Father. Specifically, when H.V.F.'s foster father, J.J., took her for a visit at the agency on February 15, 2023, he saw a small bag of marijuana (or what looked like marijuana) drop out of Father's coat. J.J. told the front desk and the Sheriff about this, and the Sheriff said he would ask Father about it. At that point, the visit was briefly stopped for a drug test, which resulted in a positive THC test for Father. During the remaining visits between that time and the April 2023 custody hearing (other than the very last visit), J.J. continued to notice that Father had a fragrance of marijuana. *Id.* at 21-22 and 125.

{¶ 26} On the day Father was drug-screened, he admitted to Katie that he smoked a "joint" or two every day. After being screened, Father admitted that he needed to re-engage in services, and Katie asked him to do so as soon as possible. However, at the time of the hearing, Father still had not re-engaged in treatment. Katie had also smelled marijuana on Father during multiple visits. Tr. at 125-127, and 147.

{¶ 27} Furthermore, Katie had spoken to Father about alcohol being a concern. During Katie's last home visit with Father (a few weeks before the custody hearing), his

---

[1] Father had also served 11 years in prison for felonious assault, which is an offense of violence. *See* R.C. 2901.01(A)(9)(a), which defines offenses of violence. These offenses include R.C. 2903.11 (felonious assault). Father was in prison on that charge from 2002 until 2013. Tr. at 174.

demeanor had changed. Father was very talkative and very vulgar, whereas he usually was not. When Katie asked Father about this, he said that since he could not smoke marijuana, he had to drink liquor, and this is what liquor did to him. Father reported drinking a beer or two a day, but Katie saw a bag on the stairs that contained a beer bottle and a mini-shot bottle that smelled like liquor. Katie said that alcohol use was also something that should be addressed at therapy, and Father needed to re-engage. A week before the custody hearing, Katie reached out to Father's therapy office to ask if he had re-engaged. She was told Father had called but had not scheduled anything. At that time, Katie told Father's case manager about the positive drug screen and the alcohol use. *Id.* at 131-133 and 143. Based on the above events, this part of Father's case plan was incomplete.

{¶ 28} During the custody hearing, Katie also testified that she and her supervisor had expressed concerns to Father's parole officer about Father's marijuana possession and his positive drug screen. Furthermore, MCCS receives "CJIS hits" whenever a person involved in a case plan is arrested.[2] Consequently, Katie became aware of Father's arrest in January 2023 and obtained a police report concerning the incident. It

---

[2] CJIS was not defined during the hearing, but it apparently is the abbreviation for "Criminal justice information services division." *See* Ohio Adm.Code 4501:2-10-01(K), eff., Oct. 1, 2024 (formerly Ohio Adm.Code 4501:2-10-01(K)). According to subsection (K), CJIS "is the FBI division responsible for the collection, warehousing, and timely dissemination of relevant CJI to the FBI and to qualified law enforcement, criminal justice, civilian, academic, employment and licensing agencies." *Id.* This is very similar to the definition in former Ohio Adm.Code 4501:2-10-01(N). "CJI" is defined as "the abstract term used to refer to all of the LEADS provided data necessary for law enforcement agencies to perform their mission and enforce the laws, including but not limited to: biometric, identity history, person (includes driver's license photo, SSN, etc.), organization, property (when accompanied by any personally identifiable information), and case/incident history data." Ohio Adm.Code 4501:2-10-01(J).

came up as a felony drug-trafficking charge, and Katie asked Father about it. In response, Father said the police had found a couple of marijuana baggies in his car, that they were not his, and that the charge was just going to be a misdemeanor. Katie reached out to Father's parole officer and to a detective but had not yet heard back at the time of the custody hearing. Father did report to Katie that a charge was pending. At the hearing, however, Father first denied that he had any criminal charges pending and claimed the marijuana belonged to his girlfriend's brother. Later, he admitted that he currently did not know what was going on with the marijuana charge. *Id.* at 127, 129, and 165-166. Thus, Father did not comply with parole conditions.

{¶ 29} Although Father had appropriate housing, his girlfriend was living there and also had a criminal history. Again, Father's stories were contradictory. He initially denied his girlfriend was living there, but later told Katie's supervisor that the girlfriend was living at his house. Katie's supervisor was able to talk briefly with the girlfriend during a home visit (which occurred when Katie was on military leave). After returning from leave, Katie was unable to make contact, and the girlfriend had not come to the agency to provide fingerprints. Katie did a cursory CJIS check and was concerned because the girlfriend had criminal charges within the previous year. Tr. at 129-130.

{¶ 30} Regarding income, Katie was aware Father had income from two jobs, but she had not been able to get paystubs from one of the jobs. The paystubs she had obtained from the other job (which was for a temporary agency) were usually for just one day at a time. Katie therefore did not know if Father was making sufficient income to pay his bills and provide for a child. *Id.* at 134-135 and 150. Later in the custody hearing,

Father made claims about his income but provided no documentation of his income or expenses. *Id.* at 168 and 171-172,

**{¶ 31}** Finally, Katie testified that the agency felt reunification with either parent was not possible within the foreseeable future because of the parents' lack of consistency and stability. She also said a grant of permanent custody to the agency was in H.V.F.'s best interest. *Id.* at 142-143. The GAL was present at the hearing and stated that, after hearing the testimony, he still recommended granting permanent custody to MCCS. *Id.* at 182.

**{¶ 32}** Having reviewed the record, we conclude that the trial court's finding under R.C. 2151.414(E)(1) was not against the manifest weight of the evidence; instead, it was supported by ample evidence. Father is simply incorrect when he claims he had substantially completed all his case plan requirements. During the case, Father failed to re-engage in drug and alcohol treatment, despite the clear need to do so, and he failed in various ways to comply with his parole, including being arrested for drug trafficking. In addition, Father failed to provide paystubs and bills to MCCS. There was no indication from him that doing so would be difficult.

**{¶ 33}** Finally, MCCS was rightly concerned about the girlfriend's criminal history, which Father did not address satisfactorily. While Father claimed his girlfriend did not live with him, his own statements were contradictory on this point. The court, as the trier of fact, was in the best position to assess credibility. *Z.C.*, 2023-Ohio-4703, at ¶ 14.

**{¶ 34}** While one finding under R.C. 2151.414(E) is sufficient, we will briefly address the remaining two factors. R.C. 2151.414(E)(4) relates to a finding that: "The

parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." Notably, H.V.F. was born in mid-April 2021, and Father claimed to have kept her at his home several times. However, Father was present in H.V.F.'s life for no more than three months at most, and he was then absent from her short life for well over a year due to his own choices. Even after Father was released from prison in early May 2022, he did not establish paternity until the end of September 2022 and did not begin visitation until October 2022. Tr. at 95 and 155-157. It is true that Father consistently visited H.V.F. from that time until the hearing. However, H.V.F. did not appear to develop a bond with Father. Furthermore, for the reasons already stated, Father's conduct demonstrated an unwillingness to provide a suitable home, since he failed to comply with simple things he was asked to do.

{¶ 35} The third factor is R.C. 2151.414(E)(13), which concerns whether: "The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child." In addition to what has already been said, we note that Father was 57 years old at the time of the custody hearing. By his own account, he had spent 33 years in prison on nine different occasions dating back to 1984. Father testified that three years was the longest period of time he had been out of prison since he was 15 years old. As indicated, Father had been in prison from 2002 until 2013 for felonious assault. Father said that when he was released, he stayed out of prison for about 10 months and then returned to prison for 18 more months. On being released

that time, he stayed out of prison again until 2015. Given the time frames involved, Father committed more crimes and returned very quickly to prison. On the last occasion, Father was imprisoned five more years for burglary. In that particular case, Father was charged also with having a weapon under disability and receiving stolen property. Tr. at 174-176.

{¶ 36} Father did not say when he was released from prison on the 2015 charge, but since he served five years, he would have been released at some point in 2020. However, Father then violated parole in August 2021 and was again sent to prison for another nine months. *Id.* at 157. As noted, Father was arrested in January 2023, again violating parole. Father also had two adult children that had been raised by other people while he was incarcerated. *Id.* at 177-178.

{¶ 37} Under the circumstances, the trial court's conclusion that Father's repeated incarceration prevented him from providing care for H.V.F. was not against the manifest weight of the evidence. While Father claimed at the custody hearing that he was older and intended to say out of prison, *id.* at 174 and 176, his prior actions during the case (when he was about the same age) contradicted this assertion. Accordingly, the trial court's finding on this factor was not against the manifest weight of the evidence. The court did not clearly lose its way and create a miscarriage of justice requiring reversal of the judgment. *Z.C.,* 2023-Ohio-4703, at ¶ 14.

{¶ 38} In connection with this assignment of error, Father contends the trial court improperly relied on the caseworker's vague and inaccurate testimony about a domestic violence charge that allegedly resulted in the August 2021 revocation. In this regard,

Father points to the fact that the trial court briefly mentioned this by noting in its entry that the case worker "was unaware if Appellant was convicted of that charge." Father's Brief at p. 11, quoting Order at p. 4. However, the court did not rely on a domestic violence conviction in making its findings. In fact, the battering program is one of the few things Father completed or mostly completed.

**{¶ 39}** Father also argues that his girlfriend was not living in his home. Again, there was contrary evidence, and, as stressed, we defer to a trial court's credibility determinations. *Z.C.* at ¶ 14.


## 2. Analysis of the Child's Best Interest

**{¶ 40}** Even if R.C. 2151.414(B)(1)(a) is satisfied, "the agency still must prove by clear and convincing evidence, that it is in the child's best interest to grant permanent custody to the agency." *In re N.M.P.*, 2020-Ohio-1458, ¶ 26, citing R.C. 2151.414(B)(1). "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. " 'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' " *Z.C.* at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

**{¶ 41}** To decide a child's best interest, courts analyze factors set forth in R.C.

2151.414(D)(1)(a)-(e). These include, but are not limited to: (a) the child's interaction and relationship "with the child's parents, relatives, foster parents and any other person who may significantly affect the child"; (b) the child's wishes; (c) the child's custodial history, "including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period"; (d) "the child's need for a legally secure permanent placement" and if it can be achieved without granting the agency permanent custody; and (e) whether any factors in R.C. 2151.414(E)(7)-(11) apply. *In re S.J.*, 2013-Ohio-2935, ¶ 15 (2d Dist.). *Accord In re P.Z.A.*, 2023-Ohio-2000, ¶ 38 (2d Dist.). Juvenile courts need not "expressly discuss each of the best-interest factors," and "[c]onsideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31. *Accord In re P.Z.A.* at ¶ 43. Nonetheless, the trial court did expressly discuss all these factors. *See* Order at p. 7-8. In reviewing the court's decision, we will consider each factor.

### a. R.C. 2151.414(D)(1)(a) (Interaction with Others)

{¶ 42} At the custody hearing, the court heard testimony from the foster parents J.J. (foster father) and A.J. (foster mother), who had taken care of H.V.F. since she first came into foster care a few months after she was born. Tr. at 6.

{¶ 43} H.V.F. had several medical and developmental issues, including: (1) torticollis of the neck, for which she attended physical therapy; (2) neonatal abstinence syndrome (NAS) and exposure to hepatitis C, for which she was followed by the NAS

clinic; (3) recurrent ear infections for which she saw an audiologist; (4) short stature and microcephaly (meaning her head was too large and her extremities were too short), for which she was followed by a geneticist at Children's Hospital; and (5) speech and developmental delays for which she received speech therapy, physical therapy, and occupational therapy.   In addition, H.V.F. had been diagnosed with trauma and other stress-related disorders in January 2023 and had been connected with case management services for treatment.   Previously, H.V.F. did not have any signs of anxiousness other than normal separation anxiety.   The foster parents shared in bringing H.V.F. to these appointments, and Father was notified of appointments through the caseworker.   *Id.* at 7-10, 32-33, 55-56, and 91-92.

{¶ 44} Father began attending appointments in October 2022.   He attended the majority of appointments but had missed a few in the last month before the April 12, 2023 hearing.   The last appointment Father attended was on March 13, 2023.   When Father was present, H.V.F. was visibly nervous, clung to the foster parents, and did not participate in the therapy activity.   When Father was not there, H.V.F. participated very well.   H.V.F. was minimally verbal, but when she turned around and saw Father, she would say "no" and cry, and she would not interact with the provider.   *Id.* at 11-14, 40, and 57.

{¶ 45} At home, H.V.F. was very well-behaved, was very loving with the foster parents, and was integrated into their extended family members, who were very close to her.   H.V.F. had also bonded well with the foster parents' two other children.   Tr. at 14-15 and 24.   The foster parents were licensed as an adoptive home, were very bonded

with H.V.F., and said they would like to pursue adoption if the agency received permanent custody.   *Id.* at 25-26, 54, and 94.

**{¶ 46}** Father visited regularly with H.V.F. once a week for two hours beginning in October 2022.   However, between then and mid-January 2023, H.V.F. cried uncontrollably when J.J. tried to leave her with Father.   Consequently, at Father's request, J.J. stayed during visitation.   J.J. stopped staying in mid-January, but H.V.F. still screamed and cried and pleaded with J.J. not to leave.   After J.J. left, H.V.F. eventually calmed down and her relationship with Father improved.   Nonetheless, after Father's visits started, H.V.F.'s separation anxiety increased tenfold, and she began having night terrors, with the first one occurring on October 27, 2022.   The night terrors had since increased in frequency, and H.V.F. sometimes had them several times a night.   *Id.* at 18-19, 45-47, 95, and 97-99.

**{¶ 47}** Father also testified during the custody hearing.   He stated that Mother told him about H.V.F. about a month after the baby was born.   At that point, Father went to see H.V.F. and then kept her at his house several times.   At the time, Father was on parole for a burglary conviction.   However, he was arrested for a parole violation on August 7, 2021 (when H.V.F. was only four months old) and was then sentenced to nine months in prison.   After being released on May 5, 2022, Father did not see H.V.F. until October 2022, i.e., more than a year had elapsed with no contact.   *Id.* at 155-157.

**{¶ 48}** Father also stated that H.V.F. was "fine," and he did not think she had all the needs that MCCS thought she had.   Tr. at 169.   Additionally, Father said he did not participate much during therapy sessions; his choice was to watch and listen.   Father

further remarked that he went to speech and physical therapy appointments but did not go to occupational therapy.   He stated that he only went to the former two therapies and to visit H.V.F. because "[i]t's all I was required to do."   *Id.* at 180.

### b.   R.C. 2151.414(D)(1)(b) (Child's Wishes)

**{¶ 49}** At the time of the hearing, H.V.F. was around two years old and was essentially non-verbal, using minimal words like yes and no.   *Id.* at 101.   Therefore, she could not express her wishes.

### c.   R.C. 2151.414(D)(1)(c)   (Custodial History)

**{¶ 50}** As indicated, the MCCS caseworker, Katie, had been assigned to the case since December 2020.   H.V.F. and her sister had been removed from Mother's care for the reasons discussed above.   H.V.F. was adjudicated dependent in October 2021 and had remained in the same foster home since she was removed from Mother's care. Thus, by the time of the custody hearing, H.V.F. had been in MCCS's custody for almost all of her short life.

### d.   R.C. 2151.414(D)(1)(d) (Need for Legally Secure Placement)

**{¶ 51}** The trial court found that H.V.F. needed a legally secure placement, noting her condition at removal and her many physical and developmental needs.   The court further stressed H.V.F.'s failure to interact with providers when Father was present, as

well as Father's belief that H.V.F. did not need all the medical services with which she was involved.   Order at 8.   The court also pointed to the lack of any maternal or paternal relatives who were able or willing to assume the child's care.   *Id.*   These observations were supported by the record.   Tr. at 123 and 138.   *See also* the discussion regarding H.V.F.'s special needs, above.


      (e)   R.C. 2151.414(D)(1)(e) (R.C. 2151.414(E)(7)-(11) Factors)

**{¶ 52}** The factors in this part of the statute "refer to matters like prior convictions for various crimes involving the child, the child's siblings, or a former child living in the parents' home; parental withholding of food or medical treatment; a parent's rejection of certain specified drug or alcohol abuse treatment; parental abandonment of the child; and a parent's prior involuntary termination of parental rights."   *In re K.P.*, 2023-Ohio-90, ¶ 69 (2d Dist.)   The trial court remarked that none of these factors applied, and Father does not suggest that they do.   Therefore, we need not consider these factors.

**{¶ 53}** In view of the above discussion, the court's decision that granting permanent custody to MCCS was in the child's best interest was supported by ample evidence and was not against the manifest weight of the evidence.   Moreover, contrary to Father's claim, he was not being disqualified due to his criminal history.   Instead, while Father made some effort, he did not substantially complete his case plan.   Even if Father had (which was not the case), we have stressed that " '[a] parent's case plan compliance, while it may be relevant to a best interest analysis, does not automatically override a trial court's decision regarding what is in a child's best interests.' "   *In re T.D.*, 2016-Ohio-

7245, ¶ 12 (2d Dist.), quoting *In re M.B.*, 2016-Ohio-793, ¶ 59 (4th Dist.) "When the focus is on the child's best interest, a trial court conceivably could terminate parental rights even if a parent completed all of her case-plan objectives." *Id.* "The case plan is simply 'a means to a goal, but not the goal itself,' and other considerations still may justify an award of permanent custody to a children-services agency." *Id.*, quoting *In re J.H.*, 2016-Ohio-640, ¶ 47 (12th Dist.).

{¶ 54} Father's actions during the case failed to demonstrate that he would be able to substantially remedy the conditions that caused H.V.F. to be placed outside the home. Although Father focuses on the fact that H.V.F. was removed due to Mother's problems, the reality was that Father was not available to assume the child's care due to his own choices. Furthermore, as MCCS notes, Father's parole violations indicate "a legitimate risk of reincarceration." MCCS Brief, p. 13. We have already discussed that fact.

{¶ 55} Father's final point is that he is a suitable parent and should not be deprived of parental rights just because the foster parents formed a deep bond with H.V.F. The court did not focus on the bond's depth in terms of deciding whether Father or the foster parents were more suitable. The court did not even mention such a point. Instead, it simply discussed the bond in the context of considering H.V.F.'s relationships with others, as is required by R.C. 2151.414(D)(1)(a).

{¶ 56} It is true that the Supreme Court of Ohio has "long held that parents who are 'suitable' have a 'paramount' right to the custody of their children." *In re B.C.*, 2014-Ohio-4558, ¶ 19, quoting *In re Perales*, 52 Ohio St.2d 89, 97 (1977). However, the court also stressed in *B.C.* that " ' "the natural rights of a parent are not absolute, but are always

subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed." ' " *Id.* at ¶ 20, quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). (Other citation omitted.) "Ultimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *Id. Accord Matter of B.T.*, 2023-Ohio-2082, ¶ 38 (2d Dist.).

{¶ 57} As noted, by statute, courts must consider a child's relationship with others, and that would include how bonded a child is to these individuals. That is not the same thing as making decisions on parental termination based on whether someone other than a parent is financially or intellectually better positioned to raise a child, as Father suggests. There was no indication of that in the trial court's decision.

{¶ 58} Based on the preceding discussion, the trial court's decision was not against the manifest weight of the evidence. Father's sole assignment of error, therefore, is overruled.

III.   Conclusion

{¶ 59} Father's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and TUCKER, J., concur.